IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| XYNGULAR CORPORATION, a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>INNUTRA, LLC, an Arizona limited liability company, INNUTRA, LLC, a California limited liability company, JAMES AYRES, an individual, CINDY HANSEN, an individual, GLEN OLIVER, an individual, CECILY KARST, an individual, and CHRIS HUMMELL, an individual,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION<br><br><br><br><br>Case No. 2:13-CV-685 TS |

This matter is before the Court on Plaintiff Xyngular Corporation's ("Xyngular") Motion for Temporary Restraining Order and Preliminary Injunction. For the reasons discussed below, the Court will deny the Motion.

## I. BACKGROUND

Plaintiff Xyngular is an international network marketing company based in Lehi, Utah. Xyngular sells nutritional supplements through a network of independent distributors.

On July 1, 2010, Xyngular entered into an agreement with Defendant James Ayres (the "2010 Agreement"). Under the 2010 Agreement, Ayres agreed to act as the face and voice of Xyngular. The 2010 Agreement contained the following relevant provisions: (1) Ayres agreed "not to represent like products to any competitive marketer to that of Xyngular"; (2) Ayres agreed to "[d]evelop product concepts and/or improvements as well as ideas to support marketing and creative efforts in order to build product awareness"; and (3) Ayres acknowledged "that the Core 4 product formulations are proprietary to Xyngular and cannot be duplicated by Ayres for any other company."[1]

The 2010 Agreement commenced on July 1, 2010, for a one year term to automatically renew for an additional one year period, unless one party gave notice to the other of its intention not to renew. On March 30, 2012, Ayres gave notice of his intent not to renew the 2010 Agreement.

After Ayres provided his notice of intent not to renew, Xyngular and Ayres continued to negotiate the terms of a new agreement, though a new contract was never signed. Ayres continued to perform work for Xyngular, but the parties dispute the terms of any agreement under which Ayres was operating. Specifically, it is disputed whether Ayres was subject to the

---

[1] Docket No. 34, Ex. B. Xyngular's Core 4 product line includes Accelerate, Flush, Cheat, and Lean.

non-compete, product development, and duplication provisions that are found in the 2010 Agreement and, as will be discussed, in a later unsigned agreement.

Ayres argues that the parties operated under an interim agreement as set forth in an August 16, 2012, email:

> 1. Terms will be flexible to allow for increased responsibilities/duties depending on "the temperature of the water."
> 2. Monthly retainer of $7000 includes all travel and time to support field requests.
> 3. Until such time determined by management and the BOD, I will forego the .2% XV monthly payment and quarterly profit share. Again, the terms will reflect flexibility with this regard.
> 4. I will receive a commission of 5% for formulations with my fingerprint on them, no matter who the selected manufacturer may be.
> 5. My firm will have increased visibility with product order activity.[2]

Xyngular, on the other hand, points to an unsigned agreement from September 24, 2012 (the "2012 Agreement"). The 2012 Agreement provides that Ayres "will not participate in any activity for the purpose of having the effect of directly or indirectly advertising or promoting a Competitor. Ayres specifically agrees that he will not permit the use of his name or likeness in connection with any Competitor or Competitor's product."[3] The 2012 Agreement also provides that Ayres would use reasonable efforts to "[d]evelop new product concepts and/or improvements to existing products."[4] However, Xyngular acknowledged "that Ayres, through his company Ayres & Associates provides similar product development services to other companies in the health care and supplements industry, and agrees that nothing contained in this

---

[2] Docket No. 61, Ex. 1-C.

[3] Docket No. 34, Ex. C.

[4] *Id*.

3

Agreement shall be read or interpreted to prohibit or constrain these activities."[5] The 2012 Agreement further provides that Ayres acknowledged "that the Core 4 product formulations are proprietary to Xyngular and cannot be duplicated by Ayres for any other company" unless Xyngular discontinued the products or did not offer them for sale.[6] As stated, Ayres never signed the 2012 Agreement.

On February 19, 2013, Ayres sent an email to Xyngular stating that, as of April 1, 2013, Ayres would discontinue his services for Xyngular.[7] Around this same time, Ayres became involved with Defendant Innutra, a competing nutritional supplement company.[8]

Certain Xyngular distributors have received an unsolicited email from Innutra, providing them a username and password to access Innutra's website for distributors. Plaintiff alleges that Defendants used Plaintiff's confidential information to send these emails. Plaintiff further alleges that Innutra engaged in false advertising in promoting its products.

Plaintiff filed this action on July 23, 2013. An Amended Complaint was filed on September 5, 2013, and this Motion was filed the same day. Plaintiff brings claims for breach of contract, Lanham Act violations, intentional interference with contract, and misappropriation of trade secrets.

---

[5] *Id*.

[6] *Id*.

[7] Docket No. 34, Ex. D.

[8] There are two Innutra Defendants: Innutra, LLC, an Arizona limited liability company "Innutra Arizona") and Innutra, LLC, a California limited liability company ("Innutra California"). Innutra California has filed a motion to dismiss for lack of personal jurisdiction. For purposes of the instant Motion, the Court will refer to the companies simply as Innutra.

II. DISCUSSION

The standard for a temporary restraining order is the same as a preliminary injunction.[9] In order for Plaintiff to be entitled to a preliminary injunction, Plaintiff must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.[10] "A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule."[11] Because it is an extraordinary remedy, "the right to relief must be clear and unequivocal."[12]

A.    LIKELIHOOD OF SUCCESS

Plaintiff argues that it is likely to succeed on its claims for misappropriation of trade secrets, breach of contract, and false advertising under the Lanham Act. Each claim will be discussed.

   *1.    Misappropriation of Trade Secrets*

Under the Utah Uniform Trade Secrets Act (the "UTSA"), a plaintiff may seek injunctive relief for "actual or threatened" misappropriation of its trade secret.[13] The threshold issue in any

---

[9]*Bachman By and through Bachman v. W. High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995) *aff'd* 132 F.3d 542 (10th Cir. 1997).

[10]*Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

[11]*GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

[12]*Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006).

[13]Utah Code Ann. § 13-24-3(1).

trade secret misappropriation case under the UTSA is "whether, in fact, there is a trade secret to be misappropriated."[14] According to the UTSA,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[15]

The UTSA defines misappropriation as follows:

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) used improper means to acquire knowledge of the trade secret; or
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (A) derived from or through a person who had utilized improper means to acquire it;
> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[16]

---

[14]*Medspring Grp., Inc. v. Feng*, 368 F. Supp. 2d 1270, 1276 (D. Utah 2005).

[15]Utah Code Ann. § 13-24-2(4).

[16]*Id*. § 13-24-2(2).

a. *Lean Formula*

Plaintiff initially argued that Defendants misappropriated their Lean formula, which Plaintiff asserts is a trade secret. However, Plaintiff stated at oral argument that it had insufficient evidence at this time to show misappropriation. Based on this concession, the Court finds that Plaintiff has failed to establish a likelihood of success on this claim.

b. *Distributor Information*

Plaintiff argues that Defendants misappropriated its distributor information and that this information should be protected as a trade secret to the same extent that customer lists are protected. Customer lists constitute trade secrets "where the customers are not known in the trade or are discoverable only by extraordinary efforts."[17] However, "where the customers are readily ascertainable outside the [owner's] business as prospective users or consumers of the [owner's] services or products, trade secret protection will not attach."[18]

The Court finds that Plaintiff has failed to present sufficient information to establish a likelihood of success on this misappropriation claim. While Plaintiff has presented evidence showing that certain distributors received an email from Innutra, they have not shown that Defendants unlawfully obtained this information by improper means. Defendants have provided declarations stating that they have not unlawfully procured any list of Xyngular distributors and

---

[17] *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 700 (Utah 1981) (quoting *Leo Silfen, Inc. v. Cream*, 278 N.E.2d 636, 639-41 (N.Y. 1972)).

[18] *Id.* (quoting *Leo Silfen*, 278 N.E.2d at 639-41).

7

Plaintiff has provided nothing to rebut this. Therefore, Plaintiff has not shown that it is likely to succeed on this claim.

2. *Contract Claims*

Plaintiff alleges that Defendant Ayres breached various provisions of the contract that governed the relationship between the parties. "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[19]

a. *Non-Compete Provision*

Plaintiff first argues that Ayres violated the non-compete clause of the contract. However, Plaintiff's success on this claim depends on its interpretation of the various contracts and negotiations between the parties. The exact agreement governing the parties' relationship is hotly disputed.

In its original Motion, Plaintiff argued that the non-compete provision stemmed from the 2010 Agreement. Plaintiff asserted that the 2010 Agreement had been extended to July 1, 2013, but that Ayres terminated the agreement early. Under Plaintiff's reading, the contract expired on May 20, 2013, 90 days after Ayres indicated he no longer wished to work with Xyngular.

Plaintiff's argument, however, ignores that on March 30, 2012, Ayres gave notice of his intent not to renew the 2010 Agreement. Under the terms of that agreement, it expired on July 1,

---

[19]*Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 391 (Utah 2001) (citing *Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)).

2012. Plaintiff has conceded for the purposes of this Motion that Ayres terminated the 2010 Agreement.

In its Reply brief, Plaintiff relies not only on the 2010 Agreement, but also on the 2012 Agreement, which also contains a non-compete clause. However, the 2012 Agreement was never signed by Ayres. Plaintiff argues that Ayres signature was not required for the contract to become binding. While this may be true, it can hardly be said that Plaintiff's right to relief on this claim is clear and unequivocal. The Court is simply not in a position at this time to determine the exact nature of the agreement between the parties. Therefore, the Court finds that Plaintiff has failed to establish a likelihood of success on this claim.

    b.  *Product Development and Non-Duplication Provisions*

Assuming that Ayres was under contract, both the 2010 and 2012 Agreements required Ayres to develop products for Xyngular and to not duplicate Xyngular's Core 4 products. Plaintiff argues that Ayres violated those provisions with his work for Innutra. As evidence, Plaintiff has provided a recording where Ayres stated that he was able to "re-sculpt and re-engineer a product line."[20] Plaintiff asserts that Ayres "duplicated Lean, Accelerate and Flush for Innutra" but provides no further analysis or evidence on this point.[21]

Defendant Ayres has presented a declaration stating that he developed Innutra's products on his own and did not use or duplicate any of Xyngular's proprietary information in doing so. At oral argument, Plaintiff acknowledged that there was not sufficient evidence to show

---

[20] Docket No. 37, Ex. A.

[21] Docket No. 32, at 20.

9

duplication at this point.  Therefore, the Court finds that Plaintiff has not established a likelihood of success on the merits of its claim concerning the duplication provision.

Plaintiff argues that, even if Ayres did not duplicate its formulations, Ayres developed Innutra's products, at least in part, while under contract with Xyngular.  Plaintiff argues that, pursuant to the product development provision of the contract, "any new products and/or improvements to existing products that Ayres developed while at Xyngular belong to Xyngular."[22]

This argument reads too much into the product development provision.  Under both contracts, Ayres agreed to develop new product concepts and/or improvements to existing products.  However, there is no exclusivity provision in any of the agreements and Ayres was free to, and did, work for other companies.  Indeed, in the 2012 Agreement Xyngular acknowledged that Ayres provided product development services to other companies and agreed "that nothing contained in this Agreement shall be read or interpreted to prohibit or constrain these activities."[23]

Plaintiff's argument would essentially mean that any new product Ayres developed while under contract with Xyngular was owned by Xyngular.  This argument is not supported by the terms of the agreements.  While Ayres certainly could not duplicate Xyngular's products, he had the ability to make new products while working for Xyngular without those products necessarily

---

[22]Docket No. 66, at 9.

[23]Docket No. 34, Ex. C.

becoming owned by Xyngular. Since Xyngular is unable to show duplication at this time, Plaintiff's argument on this point must fail.

 3. *False Advertising*

Plaintiff brings a claim under the Lanham Act for false advertising. To succeed on its false advertising claim, Plaintiff must show:

> (1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[24]

Plaintiff argues that Defendants engaged in false advertising by: (1) promoting its products using certain "before-and-after" photos; (2) posting a comparison chart on innutrametamorphosis.com, which compares Plaintiff's and Innutra's products; and (2) stating that its products and/or laboratory is FDA approved.

While Plaintiff alleges that Defendants engaged in false advertising, Plaintiff has been unable to affirmatively link any of the alleged false statements to Defendants. Therefore, the Court finds that they have failed to establish a likelihood of success on this claim.

B. REMAINING FACTORS

Because Plaintiff is unable to show a likelihood of success on the merits, the Court finds that it is unable to sustain its burden on the remaining factors. Therefore, all of the remaining factors weigh against the issuance of an injunction.

---

[24]*Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002).

## III. CONCLUSION

It is therefore

ORDERED that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 32) is DENIED. It is further

ORDERED that Defendants' Motion to Strike (Docket No. 70) is DENIED for the reasons stated at the October 22, 2013, hearing.

DATED   October 24, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge